No. 25-2027

# In the United States Court of Appeals

## for the Fourth Circuit

TITLEMAX OF SOUTH CAROLINA, INC.,
*Plaintiff-Appellant*,

*v.*

WENDY SPICHER, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE PENNSYLVANIA DEPARTMENT OF BANKING AND SECURITIES,
*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of South Carolina at Florence

## CORRECTED BRIEF OF PLAINTIFF-APPELLANT TITLEMAX OF SOUTH CAROLINA, INC.

Ryan J. Strasser
**TROUTMAN PEPPER LOCKE LLP**
1001 Haxall Point, 15th Floor
Richmond, VA 23219
(804) 697-1200
ryan.strasser@troutman.com

Misha Tseytlin
**TROUTMAN PEPPER LOCKE LLP**
111 S. Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

Christopher G. Browning
**TROUTMAN PEPPER LOCKE LLP**
305 Church at North Hills Street
Suite 1200
Raleigh, NC 27609
(919) 835-4127
chris.browning@troutman.com

Troy C. Homesley
**TROUTMAN PEPPER LOCKE LLP**
301 S College Street, 34th Floor
Charlotte, NC 28202
(704) 998-4063
troy.homesley@troutman.com

*Counsel for Plaintiff-Appellant TitleMax of South Carolina, Inc.*

## **DISCLOSURE STATEMENT**

In accordance with Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Plaintiff-Appellant TitleMax of South Carolina, Inc. states that it is not a publicly traded corporation. TMX Finance LLC is the parent corporation of TitleMax of South Carolina, Inc. TitleMax of South Carolina, Inc. is not a trade association, and no other publicly held corporation or publicly held entity has a direct financial interest in the outcome of this litigation.

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF ISSUES ..................................................................... 2

INTRODUCTION .................................................................................. 3

STATEMENT OF THE CASE ................................................................ 7

    A. TitleMax of South Carolina, Inc. Is in the Business of Negotiating and Making Loans in South Carolina and Does Not Negotiate or Make Loans in Pennsylvania. ...................................................... 7

    B. The Department Attempts to Investigate TitleMax of South Carolina, Inc. with a 2017 Subpoena and a 2024 Subpoena and to Enforce Pennsylvania's Usury Laws Against It with an Order to Show Cause—Contrary to the Department's Longstanding Position That Such Laws Apply Only to Lending *in Pennsylvania* .................................. 8

    C. TitleMax of South Carolina, Inc. Seeks to Enjoin the Secretary's Extraterritorial Regulatory Activity by Filing This Federal Lawsuit. ...... 15

    D. The Secretary Moves to Dismiss the Complaint Based on *Younger* Abstention and Issue-Preclusion Grounds, and the District Court Grants That Motion. ...................................................................... 16

    E. Meanwhile, a Number of Developments Relevant to This Case Have Occurred—Including the Holding and Conclusion of the OSC Hearing. ...................................................................................... 18

SUMMARY OF ARGUMENT ............................................................... 19

STANDARD OF REVIEW ................................................................... 21

ARGUMENT ....................................................................................... 22

  I. The District Court Legally Erred in Concluding That Issue Preclusion Applies ............................................................................................. 22

  II. The District Court's Alternative Holding—That It Had to Abstain Under *Younger*—Was Likewise Legally Incorrect. ............................. 31

    A. TitleMax of South Carolina, Inc.'s Requests for Relief as to the 2024 Subpoena and Future Extraterritorial Enforcement Proceedings Do Not Implicate *Any* Ongoing Civil Enforcement Proceedings in Pennsylvania. ............................................................................... 35

B. For All of TitleMax of South Carolina, Inc.'s Requests for Relief, the *Middlesex* Factors Powerfully Weigh in Favor of the Federal Court Exercising Jurisdiction. .................................................................42

   1. There Is No "Ongoing" Civil Enforcement Proceeding Against TitleMax of South Carolina, Inc., Within the Meaning of *Younger*.....42

   2. Pennsylvania Has No "Important State Interests" at Stake, and any State Interests Are Outweighed by Countervailing Federal Interests...44

   3. TitleMax of South Carolina, Inc. Did Not Have an Adequate Opportunity to Raise Its Personal Jurisdiction Defense in the OSC Proceeding.................................................................................49

C. The District Court Should Have Exercised Jurisdiction, Notwithstanding Any *Younger* Concerns, Under the Exception for Bad Faith, Harassment, Or Other Unusual Circumstances......................53

III. To the Extent the District Court Dismissed Any Claims As Unripe, It Erred In Dismissing Those Claims With Prejudice. .......................................55

CONCLUSION.................................................................................56

STATEMENT REGARDING ORAL ARGUMENT .............................................58

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Air Evac EMS, Inc. v. McVey*,
   37 F.4th 89 (4th Cir. 2022)..........................................................34, 53

*Allen v. Zurich Ins. Co.*,
   667 F.2d 1162 (4th Cir. 1982) ................................................23

*Andrews v. Daw*,
   201 F.3d 521 (4th Cir. 2000) ..................................................21

*Axon Enter., Inc. v. FTC*,
   598 U.S. 175 (2023) ....................................................49, 50, 51

*Cash Am. Net of Nev., LLC v. Pa. Dep't of Banking*,
   8 A.3d 282 (Pa. 2010)................................................9, 10, 11

*Cash Am. Net of Nev., LLC v. Pa. Dep't of Banking*,
   978 A.2d 1028 (Pa. Commw. Ct. July 10, 2009) ...............................10

*Celane v. Pa. Ins. Comm'r*,
   415 A.2d 130 (Pa. Commw. Ct. 1980) .........................................42

*Cent. Transp., Inc. v. Four Phase Sys., Inc.*,
   936 F.2d 256 (6th Cir. 1991) ..................................................30

*Collins v. Pond Creek Mining Co.*,
   468 F.3d 213 (4th Cir. 2006)..........................................23, 25, 30

*Colo. River Water Conservation Dist. v. United States*,
   424 U.S. 800 (1976) ...........................................................32

*Comm'r v. Sunnen*,
   333 U.S. 591 (1948) ......................................................23, 27

*State ex. rel Condon v. Hodges*,
   562 S.E.2d 623 (S.C. 2002)...............................................4, 45

*Deakins v. Monaghan*,
   484 U.S. 193 (1988) ...........................................................31

*Emps. Res. Mgmt. Co., Inc. v. Shannon,*
   65 F.3d 1126 (4th Cir. 1995) ................................................................ 32

*Ferraro v. Patterson-Erie Corp.,*
   313 A.3d 987 (Pa. 2024) ....................................................................... 44

*Goodman v. Praxair, Inc.,*
   494 F.3d 458 (4th Cir. 2007) ..........................................22, 27, 29, 31

*Google, Inc. v. Hood,*
   822 F.3d 212 (5th Cir. 2016) ................................................................ 37

*Guillemard-Ginorio v. Contreras-Gomez,*
   585 F.3d 508 (1st Cir. 2009) ................................................................ 36

*H.J. Inc. v. Northwestern Bell Tel. Co.,*
   492 U.S. 229 (1989) .............................................................................. 21

*Harper v. Pub. Serv. Comm'n of W. Va.,*
   396 F.3d 348 (4th Cir. 2005) ....................................................*passim*

*Jonathan R. by Dixon v. Just.,*
   41 F.4th 316 (4th Cir. 2022) ..........................................21, 22, 33, 49

*Laurel Sand & Gravel, Inc. v. Wilson,*
   519 F.3d 156 (4th Cir. 2008) ................................................................ 37

*Life Partners, Inc. v. Morrison,*
   484 F.3d 284 (4th Cir. 2007) ......................................................45, 46

*Martin v. Am. Bancorporation Retirement Plan,*
   407 F.3d 643 (4th Cir. 2005) ......................................23, 24, 27, 28

*Martin v. Stewart,*
   499 F.3d 360 (4th Cir. 2007) ......................................22, 30, 31, 55

*McCall v. Comm'r,*
   312 F.2d 699 (4th Cir. 1963) ......................................................23, 27, 29

*Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,*
   457 U.S. 423 (1982) ...................................................................*passim*

*Midwest Title Loans, Inc. v. Mills,*
   593 F.3d 660 (7th Cir. 2010) ................................................................ 48

*Miller v. Brown*,
   462 F.3d 312 (4th Cir. 2006) ..................................................... 39, 41

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
   526 U.S. 344 (1999) ....................................................................... 43

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
   591 F.3d 250 (4th Cir. 2009) ......................................................... 21

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*,
   491 U.S. 350 (1989) ....................................................................... 32

*Nivens v. Gilchrist*,
   444 F.3d 237 (4th Cir. 2006) ........................................... 22, 49, 51, 52

*Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*,
   477 U.S. 619 (1986) ........................................................... 39, 40, 49

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev.
   Comm'n*,
   461 U.S. 190 (1983) ....................................................................... 40

*Pennzoil Co. v. Texaco, Inc.*,
   481 U.S. 1 (1987) ........................................................................... 44

*Richardson v. Roberts*,
   355 F. Supp. 3d 367 (E.D.N.C. 2019) ........................................... 42

*Richmond, Fredericksburg & Potomac R. Co. v. Forst*,
   4 F.3d 244 (4th Cir. 1993) ............................................................. 34

*Ruiz v. Comm'r of Dep't of Transp. of City of New York*,
   858 F.2d 898 (2d Cir. 1988) ........................................................... 30

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at
   Broadlands, LLC*,
   713 F.3d 175 (4th Cir. 2013) ..................................................... 55, 56

*Sansotta v. Town of Nags Head*,
   724 F.3d 533 (4th Cir. 2013) ..................................................... 55, 56

*Simopoulos v. Va. State Bd. of Med.*,
   644 F.2d 321 (4th Cir. 1981) ..................................................... 35, 53

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ...............................................................50, 51

*Smith v. Mitchell*,
    616 A.2d 17 (Pa. Super. 1992) ..................................................9

*South Carolina v. United States*,
    912 F.3d 720 (4th Cir. 2019) ...................................................39

*Sprint Commc'ns, Inc. v. Jacobs*,
    571 U.S. 69 (2013) ...........................................................*passim*

*Steffel v. Thompson*,
    415 U.S. 452 (1974) ..................................................32, 36, 38

*Taylor v. Sturgell*,
    553 U.S. 880 (2008) ..................................................................24

*Telco Commc'ns, Inc. v. Carbaugh*,
    885 F.2d 1225 (4th Cir. 1989) ..........................................*passim*

*TitleMax of Del., Inc. v. Weissmann*,
    24 F.4th 230 (3d Cir. 2022) ............................13, 36, 38, 48

*TitleMax of Va., Inc. v. Spicher*,
    No. 7:24-cv-00532 (W.D. Va.),.................................................47

*TMX Fin. Corp. Servs., Inc. v. Spicher*,
    No. 3:24-CV-2054, 2024 WL 4995580 (N.D. Tex. Dec. 5, 2024) ........25, 26, 29

*TMX Fin. LLC v. Spicher*,
    No. 1:24-CV-2093, 2025 WL 221798 (M.D. Pa. Jan. 16, 2025)...........26, 44, 47

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) ...................................................42

*Wooley v. Maynard*,
    430 U.S. 705 (1977) ..........................................................37, 38

*Younger v. Harris*,
    401 U.S. 37 (1971) ...........................................................*passim*

*Zachair, Ltd. v. Driggs*,
    141 F.3d 1162 (4th Cir. 1998) ..........................................22, 55

**Statutes**

1 Pa. Code § 35.178 ...................................................................................... 54

1 Pa. Code § 35.190 ...................................................................................... 54

1 Pa. Code § 33.31 ........................................................................................ 43

1 Pa. Code § 33.37 ........................................................................................ 43

1 Pa. Code § 35.14 ........................................................................................ 11

1 Pa. Code § 35.226 ...................................................................................... 11

2 Pa. C.S. § 702 ............................................................................................. 11

7 P.S. §§ 6201–6219 ....................................................................................... 9

7 P.S. § 6203 ............................................................................................. 9, 47

7 P.S. § 6212 ................................................................................................. 12

7 P.S. § 6213 ................................................................................................... 9

41 P.S. §§ 101–605 .......................................................................................... 9

41 P.S. § 201 ............................................................................................. 9, 47

41 P.S. § 506 ................................................................................................. 12

71 P.S. § 733 ............................................................................................ 11, 12

28 U.S.C. § 1291 ............................................................................................. 1

28 U.S.C. § 1331 ............................................................................................. 1

42 U.S.C. § 1983 ........................................................................................... 15

Va. Code § 2.2-500 ....................................................................................... 47

**Other Authorities**

Wright & Miller, *Federal Practice & Procedure* § 4425
   (May 21, 2025 update) ........................................................... 22, 28

## **JURISDICTIONAL STATEMENT**

This appeal arises from Plaintiff-Appellant TitleMax of South Carolina, Inc. alleging violations of four provisions of the U.S. Constitution—the dormant Commerce Clause, the Full Faith and Credit Clause, and the Fourteenth Amendment's Due Process and Equal Protection Clauses. JA037-045. For each claim, the District Court had federal-question jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291, which provides this Court with jurisdiction over "appeals from all final decisions of the district courts of the United States." The District Court's order was entered on August 15, 2025, and TitleMax of South Carolina, Inc. timely noticed its appeal on August 27, 2025. JA761-762.[1]

---

[1] After the initial filing of the Joint Appendix and brief, TitleMax of South Carolina, Inc. corrected an error in its Joint Appendix that affected its citations to the Joint Appendix in its brief. TitleMax of South Carolina, Inc. therefore files this corrected brief with updated Joint Appendix citations. This corrected brief is identical to the original brief except for this footnote and updated citations to the Joint Appendix.

## STATEMENT OF ISSUES

1. Whether the District Court erred in concluding that TitleMax of South Carolina, Inc.'s claims were barred by issue preclusion given that the record is silent on whether TitleMax of South Carolina, Inc. was adequately represented in the prior proceedings and that the controlling legal and factual issues are not identical.

2. Whether *Younger v. Harris*, 401 U.S. 37 (1971), requires the District Court to abstain from adjudicating TitleMax of South Carolina, Inc.'s claims, although— among other things—they raise serious extraterritoriality concerns under the dormant Commerce Clause, as the South Carolina Attorney General, in particular, emphasized in his amicus brief below.

3. Whether any of TitleMax of South Carolina, Inc.'s claims dismissed by the District Court for a lack of ripeness should have been dismissed without prejudice.

## INTRODUCTION

TitleMax of South Carolina, Inc. is a South Carolina corporation that provides vehicle-secured title loans to qualifying consumers who appear in-person at its brick-and-mortar stores in South Carolina, consistent with the laws and policies of South Carolina—as the South Carolina Attorney General confirmed in his amicus brief supporting TitleMax of South Carolina, Inc. below. *See* JA241, 245. Nevertheless, the Secretary of the *Pennsylvania* Department of Banking and Securities has conducted a years-long, extraterritorial campaign against TitleMax of South Carolina, Inc., seeking to regulate it under *Pennsylvania's* restrictive usury laws— although TitleMax of South Carolina, Inc. has never originated any loans inside of Pennsylvania. As part of this campaign, the Secretary issued a burdensome subpoena purporting to ensnare TitleMax of South Carolina, Inc. in 2017, seeking to obtain documents related to supposed lending activities from July 2008 through September 2017 (the "2017 Subpoena"); the Secretary then issued a substantially similar subpoena in 2024, covering the subsequent period of August 23, 2017 through the present (the "2024 Subpoena"); finally, after receiving a response to the 2017 Subpoena, the Department issued an extraordinary Order to Show Cause ("OSC"), requiring TitleMax of South Carolina, Inc. to appear and defend itself in an administrative proceeding in Pennsylvania against 5,270 alleged violations of

Pennsylvania usury laws and an accompanying $52.7 million penalty, plus restitution.

TitleMax of South Carolina, Inc. brought this federal lawsuit, asserting federal constitutional claims, to stop the Secretary's extraordinary assertion of extraterritorial power. Most notably, TitleMax of South Carolina, Inc. alleges that the Secretary's extraterritorial campaign against it violates both the Fourteenth Amendment's Due Process Clause—given that Pennsylvania has no personal jurisdiction over TitleMax of South Carolina, Inc.—as well as the dormant Commerce Clause—given that the Secretary is attempting to apply Pennsylvania law outside of its borders. TitleMax of South Carolina, Inc. seeks three distinct forms of relief: (1) relief as to the 2024 Subpoena, (2) relief as to future extraterritorial enforcement proceedings, and (3) relief as to the OSC.

Notably, as South Carolina's Attorney General, the "chief law officer" of South Carolina, *State ex. rel Condon v. Hodges*, 562 S.E.2d 623, 627 (S.C. 2002) (citation omitted), explained in his amicus brief below, TitleMax of South Carolina, Inc.'s dormant Commerce Clause claim, in particular, "raises extraterritoriality concerns that go to the heart of our constitutional structure" due to the fundamental constitutional principle that "state laws may not generally operate extraterritorially." JA242 (citations omitted). Thus, the South Carolina Attorney General continued,

4

TitleMax of South Carolina, Inc.'s case implicates "serious constitutional concerns" that are vital to "the sovereignty of the State of South Carolina." JA242.

The District Court, however, dismissed the Complaint at the pleading stage, relying on two primary bases. First, the District Court concluded that, because two other district courts had dismissed on *Younger* abstention grounds similar claims against the Secretary made by certain distinct affiliates of TitleMax of South Carolina, Inc., it too had to dismiss the Complaint, based on issue preclusion. Second, the District Court concluded that, issue preclusion aside, a direct application of *Younger* required dismissal. Both bases are legally incorrect.

With respect to issue preclusion, the District Court erroneously concluded that the identical-issue and adequate-representation elements had been met. The issues relevant to this action are *not* identical to those involved in the prior district court decisions. Material and *subsequent* developments in the OSC proceeding conclusively show that TitleMax of South Carolina, Inc. had no adequate opportunity to raise its constitutional-personal-jurisdiction defense prior to any hearing on the merits in the OSC Proceeding, meaning neither collateral estoppel nor *Younger* applies. Further, TitleMax of South Carolina, Inc.'s interests were not adequately represented by any party involved in the relevant prior actions—none of whom originate loans in South Carolina—as TitleMax of South Carolina, Inc. is not in privity with those parties. And, as the South Carolina Attorney General powerfully

emphasized below, this case implicates "serious constitutional concerns" that are vital to "the sovereignty of the State of South Carolina." JA242.

The District Court's own *Younger* abstention holding was equally flawed. Regarding TitleMax of South Carolina, Inc.'s requests for relief as to the 2024 Subpoena and future enforcement proceedings, neither request even arguably seeks to disrupt any ongoing quasi-criminal civil enforcement proceedings, as is necessary for *Younger.* Subpoenas are merely investigatory tools outside of *Younger*'s scope, as numerous Circuits have held. And relief as to *future* proceedings obviously cannot disrupt *ongoing* proceedings. Likewise, TitleMax of South Carolina, Inc.'s claims regarding the OSC do not trigger *Younger*. Most notably, TitleMax of South Carolina, Inc. did not have an adequate opportunity to present its constitutional-personal-jurisdictional defenses prior to being forced to participate in the OSC Proceeding on the merits, as the rules of the Pennsylvania forum do not permit a target foreign entity to make a "limited" or "special" appearance to challenge a lack of personal jurisdiction as a threshold standalone matter before having to defend itself on the merits. Further, as the South Carolina Attorney General poignantly explained in his amicus brief below, relying on this Court's decision in *Harper v. Public Service Commission of West Virginia*, 396 F.3d 348 (4th Cir. 2005), "any important state interests in the Pennsylvania proceeding are outweighed by the

unique federal interests presented by [TitleMax of South Carolina, Inc.'s] Commerce Clause claim," JA247 (citing *Harper*, 396 F.3d at 357).

Finally, to the extent the District Court dismissed challenges to the 2024 Subpoena (and, although not addressed directly, to future enforcement proceedings) as unripe, that too was wrong. Those challenges are ripe now, given the Department's repeated, ongoing, years-long extraterritorial efforts to investigate and regulate TitleMax of South Carolina, Inc.

This Court should reverse the judgment of dismissal and remand for further proceedings. At a minimum, the Court should remand to amend the judgment to be a dismissal without prejudice, to the extent it depends upon the ripeness doctrine.

## STATEMENT OF THE CASE

### A.    TitleMax of South Carolina, Inc. Is in the Business of Negotiating and Making Loans in South Carolina and Does Not Negotiate or Make Loans in Pennsylvania.

TitleMax of South Carolina, Inc. is a South Carolina-incorporated licensed lender, authorized by the South Carolina Board of Financial Institutions to provide supervised loans in accordance with South Carolina law. JA015. TitleMax of South Carolina, Inc. offers loans secured by the consumer-borrower's car title, and it exclusively issues such loans in-person from its brick-and-mortar stores inside South Carolina. JA015. TitleMax of South Carolina, Inc.'s lending business is consistent

with the laws and policy of South Carolina—its home State—as the South Carolina Attorney General confirmed in his amicus brief below. *See* JA241, 245.

As relevant here, TitleMax of South Carolina, Inc. does not operate in Pennsylvania. Thus, it has never originated loans in Pennsylvania. JA013. It has never had offices or employees in Pennsylvania. JA013. Nor has it ever provided money to borrowers in Pennsylvania. JA013. Indeed, as just stated above, any borrower seeking to obtain a loan from TitleMax of South Carolina, Inc. must do so in-person at a brick-and-mortar store, which are *exclusively* in South Carolina, not in Pennsylvania. JA013. Critically, TitleMax of South Carolina, Inc. ceased lending to Pennsylvanians—even when they entered its brick-and-mortar stores in South Carolina to obtain a loan—in August 2017. JA025.

Likewise, none of TitleMax of South Carolina, Inc.'s affiliates operate or have ever operated in Pennsylvania. JA052, JA159, JA413-414. And many of the affiliates do not make or originate loans *at all*. Mot. Judicial Notice, Ex.A at 13–16.

**B.    The Department Attempts to Investigate TitleMax of South Carolina, Inc. with a 2017 Subpoena and a 2024 Subpoena and to Enforce Pennsylvania's Usury Laws Against It with an Order to Show Cause—Contrary to the Department's Longstanding Position That Such Laws Apply Only to Lending *in Pennsylvania*.**

Notwithstanding TitleMax of South Carolina, Inc.'s lack of connection to Pennsylvania, the Secretary and her Department have undertaken a series of investigations and an enforcement action against TitleMax of South Carolina, Inc.,

8

based on an extraterritorial (and, in TitleMax of South Carolina, Inc.'s view, unconstitutional) assertion of state power. As relevant here, these efforts include an investigative subpoena issued in 2017; an investigative subpoena issued in 2024; and an Order to Show Cause enforcement proceeding, also issued in 2024.

1. The Secretary is the chief executive and administrative officer of the Department, which is the agency responsible for regulating financial services in Pennsylvania. JA016. As relevant here, the Secretary enforces the Pennsylvania Loan Interest and Protection Law ("LIPL"), 41 P.S. §§ 101–605, and the Consumer Discount Company Act ("CDCA"), 7 P.S. §§ 6201–6219; JA023.

The CDCA and LIPL work together as part of a "sophisticated statutory scheme" regulating the "powers and responsibilities" of lenders engaging in lending in the Commonwealth. *Cash Am. Net of Nev., LLC v. Pa. Dep't of Banking*, 8 A.3d 282, 285 (Pa. 2010) ("*Cash Am. II*"). The CDCA, enacted in 1937, sets the usury limit for loans made by lenders licensed by the Department. *Id.* at 285–86; *see* 7 P.S. §§ 6203(A), 6213. It expressly applies only to "person[s]" who "engage *in this Commonwealth* . . . in the business of *negotiating* or *making* loans or advances of money on credit." *Id.* § 6203(A) (emphases added). The LIPL sets the usury limit for loans made by unlicensed lenders, 41 P.S. § 201(a), operating in tandem with the CDCA "to set forth the legal rate of interest in this Commonwealth," *Smith v. Mitchell*, 616 A.2d 17, 20 (Pa. Super. 1992).

The Department has historically understood the CDCA and the LIPL to exclude from their reach lenders with no physical presence in Pennsylvania, even if those lenders make loans to Pennsylvanians. *See Cash Am. II*, 8 A.3d at 286. Under that longstanding interpretation, which the Department articulated in interpretive letters following the CDCA's enactment in 1937, an entity like TitleMax of South Carolina, Inc. could *not* be regulated by the CDCA and LIPL even if it made loans to Pennsylvanians via mail or over the internet while those loan recipients were inside the Commonwealth. *Id.*

Despite this long interpretative history, the Department broadened its interpretation of the CDCA in 2008—that is, *70 years* after the CDCA's enactment—to govern "lending to Pennsylvania residents by any means, including by means of the internet or by mail." *Id.* Thus, under the Department's new interpretation, lenders with no physical presence in Pennsylvania would violate the CDCA if they loaned to Pennsylvanians located in Pennsylvania via internet or mail without first obtaining a license. *See id.* However, unlicensed lenders could still extend nonmortgage consumer loans with interest rates lower than six percent to borrowers within the Commonwealth. *See id.* Nevertheless, the Department still "concede[d]" under this new interpretation "that if a Pennsylvania resident physically travels to [another State] to effect a loan from [a lender], the CDCA does not apply." *Cash Am. Net of Nev., LLC v. Pa. Dep't of Banking*, 978 A.2d 1028,

1042 n.10 (Pa. Commw. Ct. July 10, 2009) ("*Cash Am. I*") (Leavitt, J., dissenting) (noting Department's concession); *see also Cash Am. II*, 8 A.3d at 286.

When the Secretary pursues an action under the CDCA and the LIPL, she does so through her Department's Compliance Office and OSC proceedings. *See* 1 Pa. Code § 35.14. Under Pennsylvania's General Rules of Administrative Practice and Procedure, a hearing examiner is charged with day-to-day oversight of virtually all aspects of the Department's OSC proceeding. *See id.* §§ 35.185–35.190. An OSC proceeding culminates in a hearing, at which the hearing examiner may consider evidence and hear arguments. *Id.* §§ 35.121–35.128. The hearing examiner's authority is limited by the Pennsylvania Banking and Securities Commission (the "Commission") within the Department. *See id.* §§ 35.180(a), 35.187(7). As particularly relevant here, the hearing examiner may only issue "proposed" adjudications, including with respect to issues of personal jurisdiction. *See id.* The "proposed" adjudication is then subject to Commission review. *See id.* Further, and as particularly relevant here, the Commission can review certain limited determinations by the hearing examiner on a discretionary, interlocutory basis, *id.* §§ 35.187(8); 35.190; *see also id.* § 35.180. Moreover, the Department has taken the position that only a "final" decision of the Commission, like an order affirming a hearing examiner's resolution of the OSC, is appealable to the Pennsylvania Commonwealth Court. *See* 2 Pa.C.S. § 702; 71 Pa.C.S. § 733-1122-A(1); 1 Pa. Code

§ 35.226. That position forecloses the possibility of respondents in a proceeding judicially challenging a threshold, "proposed" decision by a hearing examiner concluding that, for example, the Department has personal jurisdiction over the OSC respondents.

Finally, the Department has certain subpoena-issuance authority, including by requiring the production of any documents pursuant to the Secretary's authority to investigate certain corporations under the LIPL and the CDCA. *See* 7 P.S. § 6212; 41 P.S. § 506; 71 P.S. § 733-401.F; JA060.

2. Purporting to exercise her authority under the CDCA and the LIPL, as newly interpreted by the Secretary, the Secretary has launched an extended investigative and enforcement campaign against "TitleMax"—a fictional monolith that purportedly covers TitleMax of South Carolina, Inc. and certain of its affiliates. That campaign comprised, among other things: (1) her issuance of the 2017 Subpoena; (2) her issuance of the 2024 Subpoena; and (3) her issuance of an OSC enforcement action in 2024, based on the 2017 Subpoena. Each is described immediately below.

*First*, on August 22, 2017, the Department opened an investigation into loans originated outside of the Commonwealth between July 26, 2008, and September 6, 2017, to Pennsylvanians who (1) "crossed state lines to obtain [their] loan[s]" or (2) moved to Pennsylvania after the loans originated. JA025, JA143-148. The

Department did not direct the 2017 Subpoena to TitleMax of South Carolina, Inc. or, indeed, any of its affiliates. JA143. Instead, the Department issued the 2017 Subpoena broadly to "TitleMax" and "TMX Finance Family of Companies"—although there are no legal entities existing under either name. JA025, JA143. Nevertheless, TitleMax of South Carolina, Inc. voluntarily responded by substantially modifying its business operations in South Carolina. JA025. The 2017 Subpoena asserted the Department's authority to investigate potential violations of the LIPL and the CDCA, which, as explained above, apply on their face only to entities that make or negotiate loans in Pennsylvania—unlike TitleMax of South Carolina, Inc. JA143-144. After the Third Circuit rejected a challenge to the 2017 Subpoena brought by certain affiliates of TitleMax of South Carolina, Inc., *see TitleMax of Del., Inc. v. Weissmann*, 24 F.4th 230 (3d Cir. 2022), Pennsylvania's Commonwealth Court—upon a petition from the Secretary—ordered TitleMax of South Carolina, Inc. and certain affiliates to comply with a pared-down version of the subpoena (although TitleMax of South Carolina, Inc. was neither named in the subpoena nor a party to the *Weissmann* litigation), and they did so. JA026-027.

*Second*, the Secretary issued her 2024 Subpoena—a new, separate subpoena—on June 7, 2024, seeking voluminous records from TitleMax of South Carolina, Inc. and certain of its affiliates about activities between September 7, 2017, and the present. JA060-064. Again, the 2024 Subpoena was directed to a non-

existent, fictional entity the Department called "Community Choice Financial Family of Brands" or "TitleMax." JA060. Like the 2017 Subpoena, the 2024 Subpoena rested on the Department's authority to investigate potential violations of the LIPL and the CDCA. JA028. TitleMax of South Carolina, Inc. objected to the subpoena as improperly served because the Secretary merely mailed it to its principal place of business in Savannah, Georgia. JA027-028. The 2024 Subpoena remains outstanding, and the Secretary may move to enforce it at any time.

*Third*, the Secretary issued an OSC against TitleMax of South Carolina, Inc. and certain of its affiliates on June 14, 2024, based on the documents that she received in response to the 2017 Subpoena. JA028-030. The OSC includes TitleMax of South Carolina, Inc. in the Secretary's arbitrary definition of "TitleMax" and then incorrectly alleges that "TitleMax"—an apparent (fictional) monolith—issued high-interest loans to Pennsylvanians in violation of the LIPL and the CDCA. JA028-029, JA055. The OSC directed TitleMax of South Carolina, Inc. to show cause as to why it should not be required to pay $52.7 million in civil penalties, plus restitution, for these alleged violations. JA029. Of note, the "Factual Allegations" section of the OSC fails to allege any specific facts regarding TitleMax of South Carolina, Inc. JA029, JA053-055. Nor does the OSC explain how TitleMax of South Carolina, Inc. could be liable for loan originations that took place wholly outside Pennsylvania. JA029, JA053–055. TitleMax of South Carolina, Inc. objected to the service of the

OSC too because, again, it was merely mailed to its principal place of business. JA028-029.

**C.    TitleMax of South Carolina, Inc. Seeks to Enjoin the Secretary's Extraterritorial Regulatory Activity by Filing This Federal Lawsuit.**

On August 13, 2024, in response to the Secretary's extraterritorial campaign to investigate and regulate it, TitleMax of South Carolina, Inc. filed this 42 U.S.C. § 1983 lawsuit against the Secretary in the U.S. District Court for the District of South Carolina—its local federal district court in its home State. JA011. The Complaint asserts four federal-constitutional claims. JA037-45. First, it asserted a claim under the Fourteenth Amendment's Due Process Clause, claiming that the issuance of the June 2024 Subpoena and the OSC each deprive TitleMax of South Carolina, Inc. of its due-process right to avoid being haled into a jurisdiction that has no personal jurisdiction over it. JA039-42. Second, it asserted a claim under the dormant Commerce Clause, claiming that the Department's efforts to regulate TitleMax of South Carolina, Inc. are invalid extraterritorial assertions of state power. JA037-039. Third, it asserted a claim under the Fourteenth Amendment's Equal Protection Clause because the Department has discriminated against TitleMax of South Carolina, Inc. on the basis of it being a nonresident company. JA044-045. Finally, it asserted a claim under the Full Faith and Credit Clause, claiming that the Secretary failed to abide by laws of South Carolina by failing to domesticate and

serve the 2024 Subpoena and the OSC in accordance with those state laws. JA042-44.

TitleMax of South Carolina, Inc. requested three categories of relief against the Secretary in its Complaint: (1) an order prohibiting the Secretary from enforcing the 2024 Subpoena; (2) an order prohibiting the Secretary from enforcing the OSC; and (3) an order prohibiting the Secretary from taking any future, unconstitutional extraterritorial enforcement actions against it. JA045-046.

Finally, the seven other affiliates of TitleMax of South Carolina, Inc. also named in the OSC filed federal lawsuits against the Secretary in their home federal district courts, asserting similar constitutional claims. JA724. Four of those district courts transferred the challenges to the U.S. District Court for the Middle District of Pennsylvania. JA734. On December 5, 2024, the Northern District of Texas dismissed the complaint pending before it filed by one of TitleMax of South Carolina, Inc.'s affiliates on *Younger* abstention grounds. JA734. On January 16, 2025, the Middle District of Pennsylvania also dismissed the four consolidated cases before it on *Younger* grounds. JA736.

### D. The Secretary Moves to Dismiss the Complaint Based on *Younger* Abstention and Issue-Preclusion Grounds, and the District Court Grants That Motion.

1. On October 7, 2024, the Secretary moved to dismiss TitleMax of South Carolina, Inc.'s Complaint, raising three arguments. JA726. First, the Secretary

argued that the District Court could not exercise personal jurisdiction over her. JA177-184. Second, the Secretary argued that the District Court should abstain under *Younger*, given the pendency of the OSC. JA170-177. Third, the Secretary raised an issue-preclusion affirmative defense, arguing that the decisions by the Northern District of Texas and the Middle District of Pennsylvania with respect to affiliates of TitleMax of South Carolina, Inc. precluded TitleMax of South Carolina, Inc. from arguing against the application of *Younger* here. JA184-185. TitleMax of South Carolina, Inc. opposed the Secretary's motion, JA604-638, and the South Carolina Attorney General filed an amicus brief in support of TitleMax of South Carolina, Inc., explaining that the dormant Commerce Clause claim in particular implicates "serious constitutional concerns" vital to "the sovereignty of the State of South Carolina," so as to defeat the application of *Younger*, JA247.

2. On August 15, 2025, the District Court granted the Secretary's Motion to Dismiss on two primary, alternative grounds. The District Court first concluded that issue preclusion required it to dismiss all claims, given the Northern District of Texas's and the Middle District of Pennsylvania's prior *Younger* dismissal orders. JA745-757. The District Court then determined, alternatively, that *Younger* would apply regardless of those prior decisions. JA757-758. Notably, in entering that alternative holding, the District Court "acknowledge[d]" the amicus brief of the South Carolina Attorney General, but concluded that his arguments did "not alter"

17

the "conclusion that abstention is appropriate." JA758. Finally, the District Court also appeared to hold that TitleMax of South Carolina, Inc.'s challenges to the 2024 Subpoena were not ripe, given that the Secretary has not yet moved to enforce this subpoena in court. JA742-745.

### E.    Meanwhile, a Number of Developments Relevant to This Case Have Occurred—Including the Holding and Conclusion of the OSC Hearing.

Meanwhile, TitleMax of South Carolina, Inc. and the other OSC respondents filed a motion to dismiss the OSC in the state proceeding on January 30, 2025, arguing, among other grounds, that the Department lacked personal jurisdiction over it. Mot. Judicial Notice, Ex.A at 31–38. On February 28, 2025, the hearing examiner issued a "Proposed Adjudication of Respondents' Motion To Dismiss," proposing to deny the motion to dismiss by concluding that Pennsylvania had personal jurisdiction over TitleMax of South Carolina, Inc. JA641-642. TitleMax of South Carolina, Inc. moved to refer and/or certify the matter for review by the Commission, which the Department opposed and the hearing examiner subsequently denied. Mot. Judicial Notice, Ex.D. Then, TitleMax of South Carolina, Inc. sought review of the hearing examiner's proposed adjudication by filing a direct appeal with the Commission, also opposed by the Department. JA641-642. On May 29, 2025, the

Commission entered an order stating that the direct appeal was "not properly before it," such that the Commission would "take no action at this time." JA649.[2]

During the week of October 6, 2025, the hearing examiner held a three-day hearing where the Department and TitleMax of South Carolina, Inc. presented their respective cases on whether TitleMax of South Carolina, Inc. and the other parties to the state proceeding should be liable for 5,270 loans allegedly issued to Pennsylvanians outside of Pennsylvania by a number of different entities. In due course, the parties will submit post-hearing briefing, and then the hearing examiner will issue her decision, which will be reviewed by the Commission.

## SUMMARY OF ARGUMENT

The District Court legally erred in granting the Secretary's Motion To Dismiss in three respects.

*First*, the District Court erred by dismissing TitleMax of South Carolina, Inc.'s claims on issue-preclusion grounds because the prior decisions the District Court relied on neither involved issues identical in all respects nor allowed TitleMax of South Carolina, Inc. a full and fair opportunity to litigate the relevant issues. Since

---

[2] TitleMax of South Carolina, Inc. also sought to have its constitutional-personal-jurisdiction argument heard by the Pennsylvania Commonwealth Court prior to the OSC merits hearing, Mot. Judicial Notice, Ex.E, an effort that the Department also opposed, *id*. at Ex.F,G. Proceedings before that court are pending as of the date of this filing, but the Department has taken the position that the Commonwealth Court has no appellate jurisdiction to hear the appeal and in fact moved to dismiss the appeal on that basis.

those decisions issued, key factual developments have modified the record and clarified that TitleMax of South Carolina, Inc. did not have an adequate opportunity to raise its core constitutional personal-jurisdictional arguments prior to participating in a hearing on the merits in the state proceeding. Additionally, TitleMax of South Carolina, Inc. was not adequately represented by the distinct legal entities that were parties to those actions under this Court's stringent standard for virtual representation. All this prevents the application of issue preclusion.

*Second*, the District Court erroneously concluded that, in the alternative, it was required to abstain under *Younger*. TitleMax of South Carolina, Inc.'s claims regarding the 2024 Subpoena and any future enforcement action do not implicate any ongoing quasi-criminal civil enforcement proceeding, making *Younger* altogether inapplicable as to those requests for relief. Additionally, the *Middlesex* factors all heavily favor adjudicating TitleMax of South Carolina, Inc.'s federal constitutional claims, given that: service of the OSC was never accomplished, meaning that the OSC is not *ongoing* within *Younger*'s terms; this Court's overwhelming federal interest in adjudicating TitleMax of South Carolina, Inc.'s Commerce Cause claim outweighs any interest the Secretary has in this case, as the South Carolina Attorney General poignantly explained below; and TitleMax of South Carolina, Inc. was denied an adequate opportunity to raise its constitutional-personal-jurisdiction claims in the state proceeding. Finally, even if the elements for

*Younger* were satisfied, the Department's conduct and the lack of an adequate opportunity to raise its constitutional-personal-jurisdiction claims in the state proceeding trigger the bad-faith exception to *Younger*.

*Third*, the District Court abused its discretion by dismissing with prejudice those claims that it dismissed as unripe, on alternative grounds. Ripeness is a question of subject-matter jurisdiction, and any defect in subject-matter jurisdiction must result in a dismissal *without* prejudice. The Court must remand the decision to remedy this defect, to the extent it relies on a ripeness rationale here.

## STANDARD OF REVIEW

The Court reviews a dismissal under Federal Rule of Civil Procedure 12(b)(6) *de novo*, *Jonathan R. by Dixon v. Just.*, 41 F.4th 316, 327 (4th Cir. 2022), including when dismissal rests on an affirmative defense like issue preclusion, *see Andrews v. Daw*, 201 F.3d 521, 524 & n.1 (4th Cir. 2000). The Court "assume[s] all well-pled facts to be true" and "draw[s] all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009). Dismissal under Rule 12(b)(6) is appropriate only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50 (1989) (citation omitted). Further, dismissal based on an affirmative defense like issue preclusion is appropriate only in "the relatively rare circumstances where facts

sufficient to rule on an affirmative defense are alleged in the complaint." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

The Court reviews a district court's decision to abstain from exercising its jurisdiction for an abuse of discretion, *Nivens v. Gilchrist*, 444 F.3d 237, 240 (4th Cir. 2006), but reviews "whether *Younger* conditions have been met [ ] de novo," *Dixon*, 41 F.4th at 327 n.3 (citations omitted; brackets omitted). As a result, there "is little or no discretion to abstain in a case which does not meet traditional abstention requirements." *Martin v. Stewart*, 499 F.3d 360, 363 (4th Cir. 2007) (citation omitted).

Finally, "[a] district court's decision to dismiss an action with prejudice is reviewed for abuse of discretion." *Zachair, Ltd. v. Driggs*, 141 F.3d 1162 (4th Cir. 1998).

## **ARGUMENT**

## I.    **The District Court Legally Erred in Concluding That Issue Preclusion Applies.**

A. In this Circuit, "[a] party seeking to rely on the doctrine of collateral estoppel is obliged to establish five elements: (1) that the issue sought to be precluded is identical to one previously litigated (element one); (2) that the issue was actually determined in the prior proceeding (element two); (3) that the issue's determination was a critical and necessary part of the decision in the prior proceeding (element three); (4) that the prior judgment is final and valid (element four); and

(5) that the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the previous forum (element five)." *Collins v. Pond Creek Mining Co.*, 468 F.3d 213, 217 (4th Cir. 2006) (citation omitted). Failure to establish any element defeats the issue-preclusion defense, *id.*, and the party seeking to apply issue preclusion bears the burden of persuasion, *see Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982).

As to the first element, "[collateral estoppel] must be confined to situations where the matter raised in the second suit is identical in all respects." *Comm'r v. Sunnen*, 333 U.S. 591, 599 (1948). Thus "collateral estoppel applies only where controlling facts and applicable legal rules remain unchanged." *McCall v. Comm'r*, 312 F.2d 699, 703 (4th Cir. 1963); *see also* 18 Wright & Miller, *Federal Practice & Procedure* § 4425 (May 21, 2025, update). Accordingly, "where the situation is vitally altered between the time of the first judgment and the second, the prior determination is not conclusive," meaning that issue preclusion does not apply. *Sunnen*, 333 U.S. at 600. That may occur when, for example, there is an intervening state-law decision that changes the factual predicate. *Id*.

Regarding the fifth element, collateral estoppel "ordinarily applies only against persons who were parties to the prior suit, because, as a general rule, nonparties will not have had a full and fair opportunity to litigate the issues raised in the previous action." *Martin v. Am. Bancorporation Retirement Plan*, 407 F.3d 643,

654 n.18 (4th Cir. 2005). However, in certain circumstances, nonparties "found to have been in privity with a party to the original suit" "can be precluded from relitigating issues determined in a prior suit." *Id.* (citation omitted). One such circumstance is when the non-party's interests in the original action were "adequately represented by a party to the original action"—known as "virtual representation." *Id.* at 651. "In this Circuit, virtual representation has been defined narrowly." *Id.* Under the Court's "stringent standard," "there can be no virtual representation where one of the parties to the first suit was not accountable to the nonparties who filed a subsequent suit and where the virtual representative for a nonparty did not have at least the tacit approval of the court." *Id.* The "essential question" regarding the tacit-approval aspect "is whether there is a disclosed relationship in which the party is accorded authority to appear as a party on behalf of others." *Id.* at 651-52 (citation omitted). This exacting standard is vital because applying "issue preclusion to nonparties [ ] runs up against the deep-rooted historic tradition that everyone should have his own day in court." *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008).

B. Here, the District Court dismissed the Complaint based on issue preclusion, relying on decisions of the Northern District of Texas and the Middle District of Pennsylvania that dismissed claims by TitleMax of South Carolina's affiliates on *Younger* grounds. The *Younger* abstention doctrine, as relevant here and as

24

explained more fully below, *infra* Part II, requires a federal court to abstain from exercising jurisdiction where such exercise would enjoin an ongoing, quasi-criminal state proceeding against the federal plaintiff that involves a significant state interest and that provides an adequate opportunity to present federal constitutional defenses. *Infra* Part II. Issue preclusion is inapplicable here, however, because the Secretary cannot—at this preliminary stage—establish at least the first and fifth elements of the issue-preclusion test.

As to the first element, the controlling factual and legal issues between the prior district court decisions and this case are not "identical." *Pond Creek Mining Co.*, 468 F.3d at 217. As noted, *Younger* requires a district court to determine that the federal plaintiff has an *adequate opportunity* to present its constitutional defenses in the relevant quasi-criminal state proceeding. And here, the factual predicate with respect to this component of *Younger* has changed since the Northern District of Texas and the Middle District of Pennsylvania issued their *Younger* decisions—rendered eight and seven months, respectively, before the District Court rendered its decision here.

In those prior district court actions, the plaintiffs did argue that the OSC had denied them an adequate opportunity to present their constitutional personal-jurisdiction defenses prior to the OSC merits hearing, and those district courts disagreed based on the then-existing records. *See TMX Fin. Corp. Servs., Inc. v.*

25

*Spicher*, No. 3:24-CV-2054, 2024 WL 4995580 (N.D. Tex. Dec. 5, 2024); *TMX Fin. LLC v. Spicher*, No. 1:24-CV-2093, 2025 WL 221798 (M.D. Pa. Jan. 16, 2025). In particular, the Northern District of Texas concluded that "the evidence presented is insufficient" to support the conclusion that the plaintiff would not be able to obtain a final ruling on personal jurisdiction before the OSC merits hearing, "and there is no evidence presented to show that [the plaintiff] has attempted to assert lack of personal jurisdiction or was denied the opportunity to do so." *TMX Fin. Corp. Servs., Inc.*, 2024 WL 4995580, at *2. The Middle District of Pennsylvania, for its part, similarly concluded that Pennsylvania "seemingly permit[s]" motions to dismiss based on a lack of personal jurisdiction "and allow[s] for rulings on them before any hearing occurs." *TMX Fin. LLC*, 2025 WL 221798, at *10.

Here, however, TitleMax of South Carolina, Inc. presented evidence to the District Court, developed *subsequent to* the Northern District of Texas and the Middle District of Pennsylvania decisions, demonstrating that its constitutional due-process claims would not be adjudicated prior to the conclusion of the OSC on the merits. JA641-646. Specifically, it submitted the Commission's order concluding that the Commission would *not* act on TitleMax of South Carolina, Inc.'s appeal of the hearing examiner's "Proposed Adjudication" of its motion to dismiss the OSC based on a lack of personal jurisdiction. JA649. This conclusively shows that TitleMax of South Carolina, Inc. has no adequate opportunity to obtain a final

adjudication on its constitutional personal-jurisdiction defense prior to the hearing of the OSC proceeding on the merits, JA649, especially since *the OSC hearing has now concluded* (with the hearing examiner issuing her decision in due course after post-hearing briefing). And, as the South Carolina Attorney General powerfully emphasized in this very case, TitleMax of South Carolina, Inc.'s claims raise "serious constitutional concerns" that are vital to "the sovereignty of the State of South Carolina." JA242.

The Commission's order, issued after the Northern District of Texas and the Middle District of Pennsylvania issued their decisions, changes the "controlling facts" as to *Younger*, defeating issue preclusion. *McCall*, 312 F.2d at 703; *accord Sunnen*, 333 U.S. at 600; 18 Wright & Miller, *Federal Practice & Procedure* § 4425. At minimum, there are factual disputes that make dismissal on issue-preclusion grounds inappropriate at this preliminary stage. *See Goodman*, 494 F.3d at 464.

As to the fifth element, the Complaint does not facially support the conclusion that TitleMax of South Carolina, Inc. was "virtual[ly] represented" in either of the prior district court actions, such that those judgments should now preclude it from litigating these issues. *Martin*, 407 F.3d at 653 n.18.

The Complaint alleges that TitleMax of South Carolina, Inc. is its own separate entity. It is incorporated in South Carolina, JA017; it has operated exclusively from brick-and-mortar stores in South Carolina, while having a nominal

27

principal place of business elsewhere, JA015-17; and it offers title-secured loans that are governed by South Carolina law, JA018.

The Complaint is silent, *see generally* JA011-047, as to any facts that would establish that TitleMax of South Carolina, Inc. was "virtual[ly] represented" by the seven plaintiffs in the Northern District of Texas and the Middle District of Pennsylvania cases, *Martin*, 407 F.3d at 653 n.18; *see* JA724 (listing these cases). And, moreover, there are concrete differences between these entities. For example, the majority do not even originate loans, Mot. Judicial Notice, Ex.A at 13–16; another is no longer in operation, *id.* at 13-15; and another was not even in operation during the time period targeted by the OSC, *id.* at 11-13. And, for certain, none of these separate entities have ever originated loans in South Carolina. *Id.* at 11-13.

Further, the Complaint does not allege, *see generally* JA011-047, that any of the parties in the prior actions were "accountable to" TitleMax of South Carolina, Inc., *Martin*, 407 F.3d at 653. Nor does it assert that those prior district courts gave "tacit approval" that those parties were representing TitleMax of South Carolina, Inc. *Id.* As such, the Complaint's allegations do not satisfy the "stringent standard" for virtual representation. *Id.* at 652. Moreover, there could not possibly be virtual representation here because those other entities could not file in the prior cases the Commission's order denying review of the proposed adjudication, discussed above, which is powerful evidence of the lack of opportunity to raise a constitutional-

28

personal-jurisdiction defense in the state proceedings. *See, e.g.*, *TMX Fin. Corp. Servs., Inc.*, 2024 WL 4995580 at *2–3 (citing this lack of "evidence presented"). At the very least, these allegations make dismissal inappropriate at these early proceedings. *See Goodman*, 494 F.3d at 464.

C. The District Court's issue-preclusion decision—particularly as to the first and fifth elements—was incorrect.

As to the first element, the District Court improperly concluded that the *Younger* analysis here was identical to that of the Northern District of Texas and the Middle District of Pennsylvania decisions, JA746-747, reasoning that, "despite bringing new facts" to the District Court's "attention," TitleMax of South Carolina, Inc. "ha[d] *not* disputed the completeness of any facts" in those prior decisions, JA746(n.19) (emphasis in original). That is incorrect. TitleMax of South Carolina, Inc. *did* dispute the completeness of the factual record by identifying *new facts* occurring after those decisions issued—specifically, the Commission's order. JA641-645. These subsequent developments make issue preclusion inappropriate. *McCall*, 312 F.2d at 703.

As to the fifth element, the District Court erroneously concluded that TitleMax of South Carolina, Inc. was "adequately represented" in the prior district court actions. JA755-757.

As an initial matter, the District Court did not reference this Circuit's "stringent standard" for "adequate representation" and, instead, relied upon two out-of-circuit cases applying lower standards. *See* JA756 (citing *Ruiz v. Comm'r of Dep't of Transp. of City of New York*, 858 F.2d 898, 903 (2d Cir. 1988); *Cent. Transp., Inc. v. Four Phase Sys., Inc.*, 936 F.2d 256, 260 (6th Cir. 1991)). In *Ruiz*, the Second Circuit applied New York's "res judicata" standard—not its collateral-estoppel standard—which considers parties to be in privity if they had been "coparties to a prior action." 858 F.3d at 90. In *Central Transport Incorporated*, the Sixth Circuit considered whether parties were in privity based on their "close affiliation," without any reference to the rigors of attempting to satisfy those elements. 936 F.2d at 260. Neither standard compares to this Circuit's "stringent" standard. *Collins*, 468 F.3d at 217.

The District Court's privity analysis then relied on three facts, none of which support a privity conclusion under the controlling, more-stringent standard.

*First*, the District Court cited TitleMax of South Carolina, Inc.'s "coordinated litigation strategy." JA756. That TitleMax of South Carolina, Inc. may have agreed to file its lawsuit on the same day as certain affiliates does not suggest that the other entities were "accountable to" it for what occurred in their litigation, or that TitleMax of South Carolina, Inc. was "accorded authority to appear as a party" on their behalf. *Martin*, 407 F.3d at 652–53 (citation omitted).

30

*Second*, the District Court accepted the Department's conclusory, unsubstantiated, and improper allegations in the OSC that TitleMax of South Carolina, Inc. and the other OSC respondents were a monolith. JA756. Nothing in the Complaint supports that conclusion, and TitleMax of South Carolina, Inc. is vigorously disputing that characterization in the OSC itself. At the very most, these raise questions of fact, making dismissal at this early stage inappropriate. *See Goodman*, 494 F.3d at 464.

*Finally*, the District Court relied on "evidence of [a] corporate relationship" between TitleMax of South Carolina, Inc. and the parties to the prior actions, such as the facts that TMX Finance is the parent of multiple of the affiliates and that some of the affiliates shared a principal place of business. JA757. That some entities have a corporate relationship does not alone establish privity for purposes of collateral estoppel, as that relationship alone does not make them accountable to each other for what occurs in their respective litigation or establish "authority to appear as a party" on their behalf. *Martin*, 407 F.3d at 652–53 (citation omitted).

## II.    The District Court's Alternative Holding—That It Had to Abstain Under *Younger*—Was Likewise Legally Incorrect.

Federal courts have a "'virtually unflagging obligation' to exercise their jurisdiction." *Deakins v. Monaghan*, 484 U.S. 193, 203 (1988). Indeed, a federal court has "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77

31

(2013) (citations omitted). So, when a federal plaintiff brings a federal claim in federal court that "involves the same subject matter" as a state proceeding, the ordinary course is for parallel state and federal proceedings to occur. *Id.* at 72. There is no doctrine that "pendency of state judicial proceedings excludes the federal courts," *New Orleans Pub. Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 373 (1989), so a pending state action is generally "no bar to proceedings concerning the same matter in the Federal court having jurisdiction," *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

In *Younger*, the Supreme Court recognized "an extraordinary and narrow exception" to this principle, *Emps. Res. Mgmt. Co., Inc. v. Shannon*, 65 F.3d 1126, 1134 (4th Cir. 1995), requiring federal courts to abstain where the relief requested would disrupt certain ongoing state proceedings, *Younger*, 401 U.S. 37. This exception, rooted in principles of equity, comity, federalism, and efficiency, *Steffel v. Thompson*, 415 U.S. 452, 460 (1974), "represents an accommodation between a state's pursuit of important interests in its own forum and the federal interest in federal adjudication of federal rights," *Telco Commc'ns, Inc. v. Carbaugh*, 885 F.2d 1225, 1229 (4th Cir. 1989).

*Younger* extends only to "three exceptional" ongoing state proceedings: (1) state criminal prosecutions, (2) quasi-criminal civil enforcement proceedings, and (3) "civil proceedings involving certain orders . . . uniquely in furtherance of the

state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 78, 82 (citations omitted). The only category even arguably relevant here is quasi-criminal civil enforcement proceedings, which "concerns state proceedings 'akin to criminal prosecution' in 'important respects.'" *Id.* at 79. Such proceedings "are characteristically initiated to sanction the federal plaintiff, i.e., the party challenging the state action, for some wrongful act"; are initiated by a state actor; and involve investigations that "culminat[e] in the filing of a formal complaint or charges." *Id.* at 79–80(citations omitted).

Importantly, *Younger* abstention is not required "whenever a state bureaucracy has [simply] initiated contact with a putative federal plaintiff." *Telco*, 885 F.2d at 1229. Rather, quasi-criminal civil enforcement proceedings are generally more formal and procedurally advanced than mere threats of enforcement actions. *See id.* Were it otherwise, *Younger* would extend "to virtually all parallel state and federal proceedings," which "is irreconcilable with" the "dominant instruction" that abstention is "the exception, not the rule." *Sprint*, 571 U.S. at 593 (citations omitted).

Even if a "case falls into one of the three settled categories," *Younger* does not automatically apply; rather, courts must "go on to determine if federal involvement will in fact put comity at risk," after considering the *Middlesex* factors. *Dixon*, 41 F. 4th at 329; *Sprint*, 571 U.S. at 81; *see generally Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). The *Middlesex* factors

33

further confine *Younger* to situations where there is "(1) an ongoing state judicial proceeding, which (2) implicates important state interests, and (3) provides an adequate opportunity in the state proceedings to raise federal challenges." *Sprint*, 571 U.S. at 81 (citations omitted; alterations omitted). All three factors must be present "for a case to merit abstention." *Harper*, 396 F.3d at 352; *see infra* pp.42-53 (further discussing each factor).

Finally, "[a]bstention is not necessarily appropriate in every civil action that meets the formal requirements of the *Younger* doctrine." *Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 251 (4th Cir. 1993). When a state proceeding meets the requirements for *Younger*, there are "three exceptions to the court's duty to abstain: (1) 'bad faith or harassment' by state officials responsible for the prosecution; (2) a statute that is 'flagrantly and patently violative of express constitutional prohibitions'; and (3) other 'extraordinary circumstances' or 'unusual situations.'" *Air Evac EMS, Inc. v. McVey*, 37 F.4th 89, 96 (4th Cir. 2022) (quoting *Younger*, 401 U.S. at 49–54). "Neither the Supreme Court nor [the Fourth] Circuit has delineated an exhaustive list of situations that rise to the level of extraordinary circumstances." *Id.* at 99. Indeed, "[t]he very nature of 'extraordinary circumstances,' makes it impossible to anticipate and define every situation that might create a sufficient threat of such great, immediate, and irreparable injury as to warrant intervention." *Id.* (alterations omitted). Nonetheless, the failure of a state

34

proceeding to provide the federal plaintiff "an adequate opportunity to raise his constitutional claim[s]" does justify applying an exception to *Younger*. *Simopoulos v. Va. State Bd. of Med.*, 644 F.2d 321, 329 (4th Cir. 1981).

Here, as explained below, *Younger* does not apply, and the District Court erred in concluding otherwise. As an initial matter, TitleMax of South Carolina, Inc.'s requests to enjoin enforcement of the 2024 Subpoena and any future extraterritorial enforcement proceedings do not implicate any ongoing quasi-criminal civil-enforcement proceedings within *Younger*. *See infra* Part II.A. Additionally, all of the *Middlesex* factors support exercising jurisdiction as to *all* of TitleMax of South Carolina, Inc.'s three requests for relief. *See infra* Part II.B.1–3. Finally, the Department's actions in the OSC satisfy *Younger*'s bad-faith exception. *See infra* Part II.C.

### A.    TitleMax of South Carolina, Inc.'s Requests for Relief as to the 2024 Subpoena and Future Extraterritorial Enforcement Proceedings Do Not Implicate *Any* Ongoing Civil Enforcement Proceedings in Pennsylvania.

In its Complaint, TitleMax of South Carolina, Inc. asked the District Court to enjoin "any action to enforce the [ ] 2024 Subpoena" or "to further regulate TitleMax of South Carolina, Inc.'s business practices," in addition to seeking relief as to the OSC. JA046. As there is currently no pending civil-enforcement action involving either the 2024 Subpoena or any post-2017 conduct, *Younger* does not bar these two requests for relief, notwithstanding the District Court's contrary conclusion.

1. Subpoenas are not ongoing quasi-criminal civil enforcement proceedings requiring abstention under *Younger*. Quasi-criminal civil enforcement proceedings, as referenced above, are "initiated" by the State "to *sanction* the federal plaintiff" for allegedly unlawful conduct. *Sprint*, 571 U.S. at 79 (emphasis added); *supra* pp.32-33. Subpoenas, in marked contrast, are *investigative* tools that do not necessarily culminate in any action against or punishment of the federal plaintiff. *See Weissmann*, 24 F.4th at 237. As such, federal intervention after a State has issued such a subpoena "does not result in duplicative legal proceedings" or otherwise disrupt the state proceedings, leaving no justification for *Younger* abstention. *Steffel*, 415 U.S. at 462.

Indeed, this Court has "decline[d] to hold that *Younger* abstention is required whenever a state bureaucracy has [simply] initiated contact with a putative federal plaintiff" and, in fact, has held that "the period between the threat of enforcement and the onset of formal enforcement proceedings" is an "appropriate time" to raise federal challenges to a State's actions in federal court. *Telco*, 885 F.2d at 1229; *see also id.* (explaining that the contrary holding "would leave a party's constitutional rights in limbo while an agency contemplates enforcement but does not undertake it"). The First, Third, and Fifth Circuits have similarly concluded that a State's issuance of a subpoena does not trigger *Younger*. *See Guillemard-Ginorio v. Contreras-Gomez*, 585 F.3d 508, 519 (1st Cir. 2009); *Weissmann*, 24 F.4th at 237;

*Google, Inc. v. Hood*, 822 F.3d 212, 224 (5th Cir. 2016). These decisions are consistent with the Supreme Court's admonition that state action must be *ongoing* for *Younger* to apply and recognize that *Younger* is inapplicable if the "relief sought" in the federal forum "is wholly prospective." *Wooley v. Maynard*, 430 U.S. 705, 711 (1977); *Laurel Sand & Gravel, Inc. v. Wilson*, 519 F.3d 156, 167 (4th Cir. 2008).

2. Here, neither the request for relief as to the 2024 Subpoena nor the request for relief regarding future extraterritorial regulation of TitleMax of South Carolina, Inc.'s business practices by the Secretary implicate ongoing quasi-criminal civil enforcement proceedings within the meaning of *Younger*.

Separate and apart from the 2017 Subpoena and the OSC—which cover only the period from July 2008 through September 2017—the Department issued the 2024 Subpoena, seeking information concerning TitleMax of South Carolina, Inc.'s business practices from August 23, 2017, through the present. JA060-064. The Department has not initiated any action related to the 2024 Subpoena or to the time period that it covers. In that way, the Department has done nothing more than "initiate[ ] contact" with TitleMax of South Carolina, Inc. as it relates to the 2024 Subpoena, which is insufficient to justify *Younger* abstention. *Telco*, 885 F.2d at 1229. As the Department "contemplates enforcement" of the 2024 Subpoena, TitleMax of South Carolina, Inc. has appropriately brought its federal challenges in

37

federal court, and the contrary conclusion would impermissibly leave TitleMax of South Carolina, Inc.'s "constitutional rights in limbo." *Id.*

Nor does *Younger* require abstention as to any future enforcement action the Department may bring against TitleMax of South Carolina, Inc. for a time period not covered by the OSC (i.e., 2017 to present). That relief is "wholly prospective," *Wooley*, 430 U.S. at 711, and was requested before any proceeding was initiated, meaning that *Younger*'s "considerations of equity, comity, and federalism have little vitality." *Steffel*, 415 U.S. at 462. Such relief, moreover, is badly needed to preserve TitleMax of South Carolina, Inc.'s federal constitutional rights. For example, in the Third Circuit *Weissmann* litigation that preceded TitleMax of South Carolina, Inc.'s response to the 2017 Subpoena and the OSC, the Department argued that the 2017 Subpoena and the related state-court action to enforce it did not presage an enforcement action like the OSC. 24 F.4th 230 at 236. But, sure enough, after the Department received a response to the 2017 Subpoena, it initiated the OSC. JA049-058. TitleMax of South Carolina, Inc. now seeks an injunction to prevent fresh constitutional violations through the Department's future extraterritorial regulation. JA046.

3. The District Court's dismissal of TitleMax of Delaware's requests for relief related to the 2024 Subpoena and any future attempt at regulating its conduct was erroneous.

38

As an initial matter, it is unclear whether the District Court dismissed the challenge to the 2024 Subpoena based on *Younger*, ripeness, or both. After discussing *Younger*, the District Court concluded that ripeness presented a "threshold [ ] concern" regarding TitleMax of South Carolina, Inc.'s claims related to the 2024 Subpoena. JA742-745. The District Court nonetheless stated in its conclusion that ripeness "or, in the alternative, *Younger* abstention apply." JA760. In any event, neither ripeness nor *Younger* bars consideration of TitleMax of South Carolina, Inc.'s requested relief as to the 2024 Subpoena.

Beginning with ripeness, this doctrine "originates in the 'case or controversy' constraint of Article III" and requires a similar analysis to that of standing. *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019) (citations omitted). Whether a claim "is ripe turns on the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* (citation omitted). A "fit" claim is in "concrete form," meaning it is "final and not dependent on future uncertainties." *Id.* (citation omitted). This element is satisfied where "a reasonable threat of prosecution" exists. *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 625 n.1 (1986). "The hardship prong is measured by the immediacy of the threat and the burden imposed" on the plaintiff, which includes the cost "of delaying judicial review." *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006). In the context of challenges to agency actions, ripeness doctrine prevents

courts from "entangling themselves in abstract disagreements over administrative policies . . . until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 200 (1983).

Here, TitleMax of South Carolina's request as to the 2024 Subpoena is ripe. The 2024 Subpoena is still outstanding, as the Department has not withdrawn it. Rather, the Department has made clear that it is still interested in obtaining documents from the time period covered by the 2024 Subpoena. During the OSC, the Department filed an application for a subpoena from the hearing examiner targeting that exact time period. Mot. Judicial Notice, Ex.C. Since the 2024 Subpoena resembles the 2017 Subpoena but for an entirely separate and later time period, there is every reason to believe that an (unconstitutional, extraterritorial) enforcement proceeding from the Department will follow as to the 2024 Subpoena. As noted above, when the Department issued the 2017 Subpoena, it originally stated that it did not portend an enforcement proceeding, but then—sure enough—an enforcement proceeding followed the 2017 Subpoena thereafter. *Supra* pp.14-15. Thus, there can be little doubt that an additional enforcement action is imminent, making TitleMax of South Carolina, Inc.'s challenge as to the 2024 Subpoena fit for judicial review. *Ohio Civil Rights*, 477 U.S. at 625 n.1.

The pendency of the 2024 Subpoena and the threat of future regulatory activity additionally present hardship sufficient to establish ripeness. *See Miller*, 462 F.3d at 319. For example, TitleMax of South Carolina, Inc.'s injury here goes beyond the burden of turning over documents in response to the 2024 Subpoena. Rather, the 2024 Subpoena is the next distinct iteration of the Department's campaign targeted at TitleMax of South Carolina, Inc. for past conduct lawful inside South Carolina (though TitleMax of South Carolina, Inc. stopped lending to Pennsylvania residents years ago). As such, the 2024 Subpoena has a chilling effect on future activity of TitleMax of South Carolina, Inc. protected by the dormant Commerce Clause while the 2024 Subpoena remains pending.

Moving to *Younger*, the District Court did not engage in any particular *Younger* analysis for the 2024 Subpoena, seemingly lumping that distinct request for relief into TitleMax of South Carolina, Inc.'s attempts to enjoin the OSC. As explained above, however, *Younger* does not apply to the 2024 Subpoena. *See supra* pp.35-41.

Finally, as to TitleMax of South Carolina, Inc.'s request for relief regarding any future enforcement proceeding, the District Court wholly failed to address this independent claim. Again, as discussed above, *Younger* does not apply to claims for wholly prospective relief either. *See supra* pp.36-37. To the extent the District Court implicitly concluded that this request was not ripe, as it had erroneously concluded

for the 2024 Subpoena request, that conclusion fails for the same reasons: the Secretary is eagerly awaiting the opportunity to bring new extraterritorial enforcement actions against TitleMax of South Carolina, Inc., causing ongoing harm.

**B.     For All of TitleMax of South Carolina, Inc.'s Requests for Relief, the *Middlesex* Factors Powerfully Weigh in Favor of the Federal Court Exercising Jurisdiction.**

Each *Middlesex* factor weighs in favor of the District Court exercising jurisdiction over *all three* of TitleMax of South Carolina, Inc.'s requests for relief.

**1.     There Is No "Ongoing" Civil Enforcement Proceeding Against TitleMax of South Carolina, Inc., Within the Meaning of *Younger*.**

a. Under the first *Middlesex* factor, a federal court can exercise jurisdiction if doing so will not interfere with "an *ongoing* state judicial proceeding." *Middlesex*, 457 U.S. at 432 (emphasis added). A state proceeding cannot be considered "ongoing" absent the State's strict adherence to the technical requirements for proper service, as such service is a prerequisite for exercising jurisdiction over a defendant. *Celane v. Pa. Ins. Comm'r*, 415 A.2d 130, 132 (Pa. Commw. Ct. 1980); *see also Richardson v. Roberts*, 355 F. Supp. 3d 367, 370 (E.D.N.C. 2019). Federal courts must, therefore, look to whether the State has properly "served formal charges" when evaluating whether a state proceeding is ongoing for purposes of *Younger*. *See United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013) (*Younger*

inapplicable where "state proceedings have not begun against the federal plaintiffs");
*see also Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350
(1999) (holding "one becomes a party officially, and is required to take action in that
capacity, only upon service"); *Middlesex*, 457 U.S. at 428 (*Younger* applicable after
State "served a formal statement of charges").

b. Here, that the Department did not serve the OSC is established by well-
pleaded allegations in the Complaint. JA028-029. Proper service under Pennsylvania
law had to be "addressed to the person designated in the initial pleading," 1 Pa. Code
§ 33.31, with separate copies for "each" respondent, 1 Pa. Code § 33.37. The
Complaint alleges that the OSC was not served on TitleMax of South Carolina, Inc.
in accordance with Pennsylvania law because the Department's alleged service was
not addressed to TitleMax of South Carolina, Inc., specifically, and because
TitleMax of South Carolina, Inc. did not receive its own service copy. JA028-029.
And although the Department has conceded this fact during the OSC, *see* Mot.
Judicial Notice, Ex.B at 6, it failed to take any remedial steps. In the motion-to-
dismiss posture here, these allegations are sufficient to support the conclusion that
there was no *ongoing* state proceeding here, meaning that *Younger* does not
necessitate dismissal. *See Middlesex*, 457 U.S. at 428.

c. The District Court did not directly address this argument, instead simply
adopting the Middle District of Pennsylvania's reasoning on this issue. JA749. But

that court explicitly did "not decid[e]" whether service of the OSC was defective. *TMX Fin. LLC*, 2025 WL 221798, at *9. And, moreover, it accepted actual notice as a substitute for service based on a Pennsylvania tolling doctrine that applies only when the party that failed to accomplish service proceeded in good faith. *Id.* at *9. That doctrine is inapplicable because, by failing to cure the admitted defects in service, the Department has not acted in good faith, as a matter of Pennsylvania law. *See Ferraro v. Patterson-Erie Corp.*, 313 A.3d 987, 1010 (Pa. 2024).

> ### 2. Pennsylvania Has No "Important State Interests" at Stake, and any State Interests Are Outweighed by Countervailing Federal Interests.

a. The second *Middlesex* factor allows a federal court to exercise jurisdiction when the state proceeding does not "implicate *important* state interests." *Middlesex*, 457 U.S. at 432 (emphasis added). Not just any interest is sufficiently "important" to satisfy *Younger. Harper*, 396 F.3d at 353. Rather, the "State's interests in the proceeding" must be "so important that exercise of the federal judicial power would disregard the comity between the States and the National Government." *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 11 (1987). Additionally, to give this factor any meaning, the allegedly "important" state interest must be identified with sufficient specificity; otherwise, "nearly anything could at least touch on something like the 'general welfare,' 'the public good,' or 'public safety.'" *Harper*, 396 F.3d at 353.

Further, the claimed "important" state interest must be weighed against the federal interest in deciding a case, as *Harper* held, *id.* at 356, and as the South Carolina Attorney General—the "chief law officer" of South Carolina, *Condon*, 562 S.E.2d at 627—powerfully argued in his amicus brief below, JA247-249. Where the federal interest in a proceeding relates to "a core attribute of the national government," the State's interest is not sufficiently important to justify *Younger* abstention even if it implicates "attributes of state sovereignty." *Harper*, 396 F.3d at 356. That is the case, as relevant here, when an action implicates the Commerce Clause. Indeed, the Commerce Clause "plays a role in abstention analysis quite different from many other provisions of the Constitution" as "it protects all states by ensuring that no state erects the kind of barriers to trade and economic activity that threatened the survival of a fledgling country under the Articles of Confederation." *Id.* at 355–56; *see also id.* at 357. As a result, federal courts have plenary jurisdiction to vindicate the "overwhelming federal interest" in policing violations of the Commerce Clause, and "no state interest" can outweigh that interest to force *Younger* abstention. *Id.* at 356; *see also Life Partners, Inc. v. Morrison*, 484 F.3d 284, 300-01 (4th Cir. 2007). So, as the South Carolina Attorney General explained below, "a Commerce Clause claim does not implicate the values of comity and federalism that animate *Younger*," given that such claims "'implicate interstate interests by' [their] 'very nature.'" JA248 (quoting *Harper*, 396 F.3d at 356).

45

b. Here, the federal interest raised by TitleMax of South Carolina, Inc.'s claims—which claims include violations of the dormant Commerce Clause—outweighs any state interest of the Department. JA037-039. Again, the federal interest in protecting against such Commerce Clause violations is *sui generis* in the abstention analysis, since the Commerce Clause promotes comity and federalism (i.e., the same interests that sometimes support *Younger* abstention) by removing certain types of economic regulation from the States' province. *See Harper*, 396 F.3d at 356. Thus, TitleMax of South Carolina, Inc.'s Complaint against the Department's extraterritorial regulation of its commercial activity represent precisely the type of claim that federal courts must decide. *Id.*; *Life Partners*, 484 F.3d at 300–01.

The South Carolina Attorney General's amicus brief below powerfully accentuates this point. There, the South Carolina Attorney General explained that the Department's conduct violates the sovereignty of other States—most notably, his own State—by unconstitutionally attempting to control business operations, employees, and corporations that exist wholly outside of Pennsylvania. *See* JA242-245. Thus, "any important state interests in the Pennsylvania proceeding are outweighed by the unique federal interests presented by [TitleMax of South Carolina, Inc.'s] Commerce Clause claim," defeating *Younger* abstention. JA247. The State Attorneys General of Virginia, Nebraska, and Utah—joined too by the South Carolina Attorney General—articulated the same view in a federal proceeding

instituted by independent affiliates of TitleMax of South Carolina, Inc. in a case originally filed in the U.S. District Court for the Western District of Virginia.[3] Br. of the Commonwealth of Virginia, State of South Carolina, State of Nebraska, and State of Utah as Amici Curiae in Supp. of Pl., *TitleMax of Va., Inc. v. Spicher*, No. 7:24-cv-00532 (W.D. Va.), Dkt.55 (Nov. 20, 2024); *see also* Va. Code § 2.2-500 ("The Attorney General shall be the chief executive officer of the Department of Law[.]").

Finally, any interest that Pennsylvania may have in prohibiting usury is inapplicable. As the Complaint alleges, TitleMax of South Carolina, Inc. has never negotiated or made loans in Pennsylvania, JA013, which is necessary for Pennsylvania's usury laws—and, therefore, Pennsylvania's interest in enforcing those laws—to apply. 41 P.S. § 201(a); 7 P.S. § 6203(A). Pennsylvania cannot have an "important" interest in prohibiting usury by any entity in other States where the challenged conduct is legal. Elevating one State's purported, generalized interest in nationwide regulation of interest rates above constitutional rights—particularly those involving interstate commerce—would render the second *Middlesex* factor meaningless. *See Harper*, 396 F.3d at 353.

---

[3] Unfortunately, when the case was subsequently transferred to the U.S. District Court for the Middle District of Pennsylvania, that transferee court did not consider the independent state sovereignty interests articulated by the Attorneys General of Virginia, South Carolina, Nebraska, and Utah in their amici brief filed with a district court in this Circuit. *See generally TMX Fin. LLC*, 2025 WL 221798.

c. The District Court's "important state interest" analysis is unpersuasive. JA739, 758-759.

*First*, the District Court found that the federal interest in preventing Commerce Clause violations had less "force" because the Third Circuit in *Weissman* found that the 2017 Subpoena did not constitute impermissible extraterritorial regulation. JA758. That fails because, as noted above, *Weissmann* involved a challenge to the Department's attempted enforcement of a subpoena, 24 F.4th at 236—*not* an enforcement action like the OSC, which seeks to impose over $50 million in penalties, *see supra* p.14. The OSC presents more significant federalism and comity concerns than the *Weissmann* subpoena because the Department is now seeking to punish (rather than just investigate) business activity that was legal where it took place. In any event, *Weissmann* represents just one side of a Circuit split. *See Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 668 (7th Cir. 2010) (concluding that Commerce Clause interest was greater than State's interest in "applying its own law").

*Second*, the District Court "acknowledge[d]" the South Carolina Attorney General's amicus brief, but it did not view his "concerns" as sufficient to outweigh Pennsylvania's interest. JA758-759. Given *Harper*'s exposition of the Commerce Clause's preeminence in the *Middlesex*-factor-two analysis, the District Court's dismissal of the significant state sovereignty interests articulated by the South

Carolina Attorney General is contrary to this Circuit's authority. In short, the South Carolina Attorney General was entirely correct: because TitleMax of South Carolina, Inc.'s case raises "important extraterritoriality issues" and "serious constitutional concerns," "*Younger* abstention is unwarranted." JA241-242.

### 3. TitleMax of South Carolina, Inc. Did Not Have an Adequate Opportunity to Raise Its Personal Jurisdiction Defense in the OSC Proceeding.

a. The final *Middlesex* factor allows for federal courts to exercise jurisdiction where the state proceeding does not "have adequate procedures in place for the raising of federal constitutional claims." *Nivens*, 444 F.3d at 246. Abstention is therefore not "appropriate" where "state law *clearly bars*" a litigant from bringing constitutional claims, *id.* at 244, or functionally bars meaningful consideration of a federal plaintiff's claims for relief, *Dixon*, 41 F.4th at 335–39. Stated differently, to provide an adequate opportunity to raise federal constitutional challenges, there must be a procedure for the relevant state adjudicator to consider and resolve those claims. *Middlesex*, 457 U.S. at 435; *see Ohio Civ. Rights*, 477 U.S. at 629 (assuming that plaintiff, who had sought a ruling on a motion to dismiss, could "raise[ ]" her "constitutional claims . . . in state-court judicial review of the administrative proceeding").

The Supreme Court in *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), provides helpful context for defining what is an "adequate" opportunity to raise a

federal constitutional defense. *Id.* at 190–92. Specifically, the determination of whether a procedure is adequate focuses on "the nature of the claims and accompanying harms that the parties are asserting." *Id.* at 192. In other words, for a procedure to be adequate, it must preserve the federal constitutional right at issue. *See id.* So, in *Axon* itself, for example, the Court explained that the only adequate procedure for a party to raise a claim of "being subjected to unconstitutional agency authority" was through review of that claim *before* the agency exercised that allegedly unconstitutional authority. *Id.* at 191 (citations omitted). That is because—absent such pre-hearing review—a party would have no way to vindicate on appeal the right not to be subject to the allegedly unconstitutional proceeding after the conclusion of that allegedly unconstitutional proceeding itself. *Id.*

b. Here, TitleMax of South Carolina, Inc. lacked an adequate opportunity to have its federal constitutional claims heard in Pennsylvania before it had to participate in the OSC merits hearing.

To begin, by its very "nature," *id.* at 192, a party's personal-jurisdiction defense to a State's attempt to subject that party to a quasi-criminal-enforcement proceeding in the State must be resolved *before* the objected-to proceeding is heard on the merits, in order for the personal-jurisdiction defense to be heard. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430–31 (2007). That is because the question of whether a State has personal jurisdiction over a party

logically precedes the question of whether that State has any power to subject that party to a quasi-criminal-enforcement proceeding. *See id.* That is why, as the Supreme Court explained in *Sinochem*, a court "generally may not rule on the merits of a case without first determining that it has jurisdiction over the . . . parties (personal jurisdiction)." *Id.* at 430–31; *see Axon*, 598 U.S. at 192.

In this case, Pennsylvania failed to afford TitleMax of South Carolina, Inc. an adequate opportunity to be heard on its constitutional-personal-jurisdiction defense, *Nivens*, 444 F.3d at 244, because the Department did not enter a *final* decision concluding that it had personal jurisdiction over TitleMax of South Carolina, Inc. before hearing and concluding the OSC on the merits, JA649; *see supra* p.19 (explaining that the OSC hearing concluded on October 8, 2025). Thus, TitleMax of South Carolina, Inc. was "subjected to [ ] agency authority" *before* any adjudicatory body ever finally concluded that the exercise of that authority was "[ ]constitutional," notwithstanding TitleMax of South Carolina, Inc.'s constitutional-personal-jurisdiction claims. *Axon*, 598 U.S. at 192; *accord Sinochem*, 549 U.S. at 430–31. That cannot be "adequate procedures . . . for the raising of [this] federal constitutional claim[ ]," so as to possibly justify *Younger*. *Nivens*, 444 F.3d at 246.

Notably, Pennsylvania's failure to provide TitleMax of South Carolina, Inc. with adequate procedures to hear its constitutional claims did not happen by

accident. As TitleMax of South Carolina, Inc. has repeatedly argued, Pennsylvania's rules prohibited it from obtaining a final decision on personal jurisdiction before the OSC merits hearing, as no procedure for the making of a "limited" or "special" appearance existed under the applicable agency rules of procedure. JA619-623. Accordingly, as TitleMax of South Carolina, Inc. predicted, the hearing examiner provided only a *proposed* adjudication on personal jurisdiction. JA641-642. Then, after TitleMax of South Carolina, Inc. attempted to appeal that decision, the Commission stated that TitleMax of South Carolina, Inc.'s appeal was "not properly before it," such that it would "take no action at this time." JA649. Again, that administrative-review process is simply not "adequate" for the adjudication of a constitutional claim. *Nivens*, 444 F.3d at 246.

c. The District Court, with respect, misapprehended the factual record when it determined that TitleMax of South Carolina, Inc. did have an adequate opportunity to raise its constitutional claims before the OSC merits hearing. *See* JA748-749. Indeed, the District Court's opinion suggests that TitleMax of South Carolina, Inc. would have its due-process claim decided even by the Pennsylvania Commonwealth Court in advance of the hearing. *See* JA749. Neither is correct. As explained above, the factual record shows that TitleMax of South Carolina, Inc. will not receive *any* final decision from either the Commission or the Commonwealth Court regarding its constitutional-personal-jurisdiction defense until *after* the OSC proceeding has

52

concluded. Indeed, the Commission has already issued an order stating that the appeal of the "Proposed Adjudication" was "not properly before it" such that it would "take no action." JA619-623, JA641-650.

### C. The District Court Should Have Exercised Jurisdiction, Notwithstanding Any *Younger* Concerns, Under the Exception for Bad Faith, Harassment, Or Other Unusual Circumstances.

1. Finally, even if a state proceeding meets the requirements for *Younger*, there are "three exceptions to the court's duty to abstain: (1) 'bad faith or harassment' by state officials responsible for the prosecution; (2) a statute that is 'flagrantly and patently violative of express constitutional prohibitions'; and (3) other 'extraordinary circumstances' or 'unusual situations.'" *Air Evac EMS*, 37 F.4th at 96 (quoting *Younger*, 401 U.S. at 49–54). The failure of a state proceeding to provide the "federal plaintiff an [adequate] opportunity to raise his constitutional claims[s]" justifies applying an exception to *Younger*, even as this Court has declined to attempt to delineate every circumstance that may meet such exceptions. *Simopoulos*, 644 F.2d at 329.

2. Here, the Department's years-long attempt at extraterritorial enforcement of the LIPL and CDCA against TitleMax of South Carolina, Inc. without allowing an adequate opportunity for raising constitutional claims constitutes bad faith, warranting an exception to *Younger*. While several facts bear this out, the most notable is the Department's representation to the Pennsylvania Commonwealth

Court that Pennsylvania's rules did *not* prevent the hearing examiner from issuing a final decision on TitleMax of South Carolina, Inc.'s constitutional-personal-jurisdiction claims. *See* JA176-177 ("Plaintiff can defend the action by arguing that the U.S. Constitution bars the enforcement proceeding and/or move to dismiss the proceeding based on lack of personal jurisdiction 'at any time.' 1 Pa. Code 35.178 . . . . If that motion is denied, Plaintiff can seek an immediate appeal to the Banking and Securities Commission pursuant to 1 Pa. Code 35.190."). Further, outside counsel for the Department made this exact same representation to another district court considering a case brought by certain affiliates of TitleMax of South Carolina, Inc. Mot. Judicial Notice, Ex.H at 12–14. *This representation was not true.* As explained above, the hearing examiner issued only a "proposed"—not final—adjudication on TitleMax of South Carolina, Inc.'s personal-jurisdiction claims prior to the OSC merits hearing, and the Commission then concluded that TitleMax of South Carolina, Inc.'s appeal from that "proposed" adjudication was "not properly before it," such that it would "take no action" prior to the OSC meris hearing. JA641-649; *see supra* pp.18-19.

3. The District Court, with respect, appeared to conclude that the bad-faith exception did not apply based on the erroneous belief that the Commission did, in fact, consider and deny on the merits the appeal of the hearing examiner's proposed adjudication. JA748. Again, that is not what happened here, as the Commission's

order states on its face that the appeal was "not properly before it," so it refused to act on it. JA747-748. That nonaction in the face of the Department's assertions to the Pennsylvania Commonwealth Court to the contrary confirms that the bad-faith exception applies, defeating any application of *Younger* here.

### III.   To the Extent the District Court Dismissed Any Claims As Unripe, It Erred In Dismissing Those Claims With Prejudice.

A. Although district courts generally have discretion to determine whether to dismiss with or without prejudice, *Zachair, Ltd.*, 141 F.3d 1162, a dismissal for any subject-matter jurisdiction defect "must be one without prejudice, because a court that lacks jurisdiction has no power to adjudicate and dispose of a claim on the merits," *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013). Ripeness is one such subject-matter-jurisdiction question, *Sansotta v. Town of Nags Head*, 724 F.3d 533, 548 (4th Cir. 2013), meaning that dismissals based on a lack of ripeness must be without prejudice, *S. Walk*, 713 F.3d at 185. Thus, a district court that purports to dismiss with prejudice a claim that is unripe has erred as a matter of law. *See id.*; *see generally Martin*, 499 F.3d at 363 ("A district court abuses its discretion whenever 'its decision is guided by erroneous legal principles.'" (citation omitted)).

B. Here, as discussed above, the District Court appeared to dismiss TitleMax of South Carolina, Inc.'s claim related to the 2024 Subpoena on the alternative grounds that it was unripe. JA743-745; *supra* p.18. Nonetheless, the District Court

then ordered dismissal of the *entire* Complaint "with prejudice," JA760 (emphasis added), without specifying that its dismissal of the challenge to the 2024 Subpoena based on a ripeness rationale was without prejudice. So, to the extent the that the District Court intended to dismiss the claim against the 2024 Subpoena (and, although not directly addressed by the District Court, claims against future enforcement proceedings) as unripe, the District Court legally erred. *S. Walk*, 713 F.3d at 185; *Sansotta*, 724 F.3d at 548. Accordingly, should this Court affirm any part of the District Court's order on a ripeness rationale, it must at a minimum remand with instructions to amend the judgment to dismissal without prejudice as to that part.

## **CONCLUSION**

This Court should reverse the judgment of dismissal and remand for further proceedings. At a minimum, the Court should remand to amend the judgment to be a dismissal without prejudice, to the extent it depends upon the ripeness doctrine.

Date: October 16, 2025

Respectfully submitted,

*/s/ Ryan J. Strasser*

Misha Tseytlin
**TROUTMAN PEPPER LOCKE LLP**
111 S. Wacker Dr., Suite 4100
Chicago, IL 60606
(608) 999-1240
misha.tseytlin@troutman.com

Chris G. Browning
**TROUTMAN PEPPER LOCKE LLP**
305 Church at North Hills Street
Suite 1200
Raleigh, NC 27609
(919) 835-4127
chris.browning@troutman.com

Ryan J. Strasser
**TROUTMAN PEPPER LOCKE LLP**
1001 Haxall Point, 15th Floor
Richmond, VA 23219
Tele: (804) 697-1200
ryan.strasser@troutman.com

Troy C. Homesley
**TROUTMAN PEPPER LOCKE LLP**
301 S College Street, 34th Floor
Charlotte, NC 28202
(704) 998-4063
troy.homesley@troutman.com

*Counsel to Plaintiff-Appellant TitleMax of South Carolina, Inc., Inc.*

## STATEMENT REGARDING ORAL ARGUMENT

TitleMax of South Carolina, Inc. respectfully requests oral argument pursuant to Federal Rule of Appellate Procedure 34(a) and Local Rule 34(a). This case involves important constitutional questions of state overreach. Given the magnitude of potential harm and the case's serious implications for how Pennsylvania relates to the federal courts and to other States, TitleMax of South Carolina, Inc. respectfully submits that oral argument would afford the parties and the Court an opportunity to explore these issues more fully.

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Appellate Procedure 32(g), this document complies with (1) the word limits of Federal Rule of Appellate Procedure 32(a)(7)(b), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,946 words; and (2) the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because this document has been prepared in a proportionally spaced typeface (14 point, Times New Roman font) using Microsoft Word.

*/s/ Ryan J. Strasser*
Ryan J. Strasser
